UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JOSE COLON,

              Plaintiff,

- against -

CITY OF NEW YORK, et al.,

              Defendants.
--------------------------------------------------------X
MAXIMO COLON,

              Plaintiff,

- against -

CITY OF NEW YORK, et al.,

              Defendants.
--------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

09 CV 0008 (JBW)

09 CV 0009 (JBW)

On January 5, 2009, plaintiffs Jose Colon and Maximo Colon filed these actions against

defendants the City of New York, Detective Miguel Carvajal, Police Officers Henry Tavarez,

Steven Anderson, Alan Figueroa, and Police Officers John and Jane Doe #1-10, individually and

in their official capacities, seeking damages incurred as a result of deprivations of plaintiffs' civil

rights, in violation of 42 U.S.C. §§ 1983, 1988, and various provisions of the United States

Constitution and New York State law.

On July 13, 2010, plaintiffs moved for entry of a default judgment against defendants

Henry Tavarez and Steven Anderson,[1] and on September 7, 2010, the Clerk of Court entered a

---

[1]Defendants Tavarez and Anderson are no longer employed as New York City Police
Officers.

default against those defendants. On August 20, 2010, the case was referred to the undersigned
to conduct an inquest and to issue a Report and Recommendation as to damages.

This Court conducted a hearing on damages on October 27, 2010, at which time
defendants Tavarez and Anderson failed to appear. Based on the papers submitted in connection
with plaintiff's motion for a default judgment, and the evidence presented at the inquest hearing,
the Court respectfully recommends that defendants Tavarez and Anderson be held jointly and
severally liable and that plaintiff Jose Colon be awarded $213,393.95, representing $131,708.95
in lost wages, $50,000 in emotional distress damages, $31,185.00 in attorney's fees, and $500.00
in costs. The Court respectfully recommends that plaintiff Maximo Colon be awarded
$218,943.95, representing $131,708.95 in lost wages, $65,000 in emotional distress damages,
$21,735.00 in attorney's fees, and $500.00 in costs.

## FACTUAL BACKGROUND

On January 5, 2008, plaintiffs Jose Colon and Maximo Colon visited the Delicias de Mi
Terra bar/nightclub in Elmhurst, New York. (J.C. Compl.[2] ¶ 13; M.C. Compl.[3] ¶ 15). Plaintiffs
allege that about an hour-and-a-half after they arrived, plain-clothes police officers, Henry
Tavarez, Steven Anderson, and Alan Figueroa, entered the nightclub.[4] (J.C. Compl. ¶¶ 15, 16,

[2]Citations to "J.C. Compl." refer to Jose Colon's Complaint, filed January 5, 2009.

[3]Citations to "M.C. Compl." refer to Maximo Colon's Complaint, filed January 5, 2009.

[4]Plaintiffs indicate that they did not approach any of these three officers at any point that
night. (J.C. Compl. ¶ 21; M.C. Compl. ¶ 21). Although unclear from plaintiffs' Complaints, it
seems that another group of police officers eventually entered the nightclub, at which point the
indoor lights were turned on and the music was turned off. (J.C. Compl. ¶ 17; M.C. Compl. ¶¶
17).

2

18; M.C. Compl. ¶¶ 15, 16, 18). Later that night, Detective Carvajal, who also arrived at the nightclub at some point that evening,[5] told the plaintiffs to face the wall and then proceeded to handcuff them and place them under arrest. (J.C. Compl. ¶¶ 18, 19, 22; M.C. Compl. ¶¶ 18, 19, 22). Plaintiffs were taken from the nightclub and driven to the police precinct in Queens, where they were fingerprinted, photographed, and strip searched. (J.C. Compl. ¶¶ 23-25; M.C. Compl. ¶¶ 23-25). Plaintiffs were not informed of the reason for their arrests until they were arraigned and their attorneys informed them that they were being charged with a sale of narcotics to an undercover police officer. (J.C. Compl. ¶ 28; M.C. Compl. ¶ 28).

Plaintiffs allege that at no time did they come into contact with the police officers until they were approached and placed under arrest. (J.C. Compl. ¶ 22; M.C. Compl. ¶ 22). After being arraigned, Jose was released but Maximo was detained. (Berliner & Hall Decl.[6] ¶ 17). Plaintiff Jose Colon later obtained a copy of the nightclub surveillance video from the night of the alleged incident, which confirmed that plaintiffs had no contact with police officers Henry Tavarez, Steven Anderson, or Alan Figueroa while at the nightclub prior to their arrest. (J.C. Compl. ¶¶ 31, 32; M.C. Compl. ¶¶ 31, 32). Later that day, Jose posted bail for Maximo. (Berliner & Hall Decl. ¶ 18). Plaintiffs made approximately three or four court appearances related to these criminal charges. (Id. ¶ 19). Roughly six months after the arrests, on June 26,

---

[5]Although plaintiffs' Complaints indicate that three plain-clothes officers, later identified as Officers Anderson, Tavarez, and Figueroa, were at the nightclub for some time, it is unclear when Detective Carvajal, the arresting officer, arrived at the nightclub. Plaintiffs also fail to indicate whether Detective Carvajal was also undercover.

[6]Citations to "Berliner & Hall Decl." refer to the Declaration of Rochelle S. Berliner, Esq., and Christina A. Hall, Esq., filed on August 13, 2011 in support of their joint motion for attorney's fees.

3

2008, the Queens County District Attorney dismissed the criminal charges against Jose and
Maximo Colon. (J.C. Compl. ¶ 33; M.C. Compl. ¶ 33).

Plaintiffs allege that their arrests were made without probable cause and were based on
false information provided by Officers Tavarez, Anderson, and Figueroa.[7] (J.C. Compl. ¶ 34;
M.C. Compl. ¶ 34). Specifically, plaintiff alleges that defendant Tavarez claimed that Maximo
Colon received $100 from him to purchase two packages of cocaine and that plaintiff Maximo
patted down Tavarez and asked him if he was wearing a wire. (M.C. Compl. ¶ 35). Defendant
Tavarez also allegedly falsely claimed that plaintiff Jose Colon handed him two packages
containing cocaine.[8] (J.C. Compl. ¶ 35).

Plaintiffs claim that, as a result of the false arrest, they suffered physical injuries,
emotional distress, embarrassment, humiliation, and deprivation of their constitutional rights.
(J.C. Compl. ¶ 37; M.C. Compl. ¶ 37).

---

[7]Although not mentioned in plaintiffs' Complaints, during a hearing before the Honorable
Jack B. Weinstein, defendant City of New York indicated that defendants Anderson and Tavarez,
and possibly also Figueroa, conspired to frame plaintiffs by planting evidence on them –
"flaking" – leading to their alleged false arrest. (8/20/10 Tr. at 9).

[8]In their Declaration in support of their fee request, plaintiffs' counsel explain that

> [t]he Queens County District Attorney conducted a thorough investigation into
> Plaintiffs' claim that defendants Tavarez, Anderson, and Figueroa violated their
> civil rights by fabricating a drug sale and claiming that Jose and Maximo Colon
> and their friends were the perpetrators of the crime. Following the investigation,
> the District Attorney obtained an indictment against defendants Tavarez and
> Anderson charging them each with multiple felonies, including Criminal Sale of a
> Controlled Substance in the Third Degree and Offering a False Instrument for
> Filing. Defendants Tavarez and Anderson were then arrested on or about January
> 15, 2009. Upon information and belief, both defendants subsequently pled guilty
> and fully admitted their guilt.

(Berliner & Hall Decl. ¶ 20).

4

## PROCEDURAL HISTORY

Plaintiffs filed this action on January 5, 2009, and effectuated service on defendants

Henry Tavarez and Steven Anderson on March 20, 2009, by personally handing them a copy of

the Summons and Complaint at the Queens County Courthouse on that date. (J.C. Berliner Decl.

Tavarez[9] ¶ 2; J.C. Berliner Decl. Anderson[10] ¶ 2; M.C. Berliner Decl. Tavarez[11] ¶ 2; J.C. Berliner

Decl. Anderson[12] ¶ 2).

When defendants Tavarez and Anderson failed to answer or otherwise respond to the

Complaints, plaintiffs moved for entry of default judgment against those defendants on July 13,

2010. Defaults as to Tavarez and Anderson were entered by the Clerk of Court on September 7,

2010. The Honorable Jack B. Weinstein subsequently referred these matters to the undersigned

to conduct an inquest and issue a Report and Recommendation on damages. (Tr.[13] at 6).

This Court then issued an Order setting dates for the plaintiff to submit proof of damages

---

[9]Citations to "J.C. Berliner Decl. Tavarez" refer to the Declaration of Rochelle S. Berliner, filed in support of plaintiff Jose Colon's motion for default judgment against defendant Henry Tavarez on July 13, 2010.

[10]Citations to "J.C. Berliner Decl. Anderson" refer to the Declaration of Rochelle S. Berliner, filed in support of Jose Colon's motion for default judgment against defendant Steven Anderson on July 13, 2010.

[11]Citations to "M.C. Berliner Decl. Tavarez" refer to the Declaration of Rochelle S. Berliner, filed in support of plaintiff Maximo Colon's motion for default judgment against Henry Tavarez on July 13, 2010.

[12]Citations to "M.C. Berliner Decl. Anderson" refer to the Declaration of Rochelle S. Berliner, filed in support of plaintiff Maximo Colon's motion for default judgment against Steven Anderson on July 13, 2010.

[13]Citations to "8/20/10 Tr." refer to the transcript of the proceedings before the Honorable Jack B. Weinstein held on August 20, 2010.

5

and for an inquest hearing, which was held on October 27, 2010.

## DISCUSSION

### A. Default Judgment

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. P. 55(a). Rule 55 sets forth a two-part procedure for entering a default judgement. See Fed. R. Civ. P. 55(b)(2); Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2; see Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993). Pursuant to Rule 55(a), the court clerk first enters a default by noting the defaulting party's failure to respond or appear. See id. If the defaulting party then fails to successfully vacate the default pursuant to Rule 55(c), the court may enter a default judgment. Id. Where the amount of damages owed requires a judicial finding, a default judgment may be entered once the court has conducted a hearing or made a referral to determine the question of damages. See Fed. R. Civ. P. 55(b).

In determining whether a default judgment should be entered, the Second Circuit has cautioned that a default judgment is an extreme remedy that "must remain a weapon of last, rather than first, resort." Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the pressure on district courts "to dispose of cases that . . . delay and clog . . . [their] calendar[s]" due to the litigants' "disregard of the rules," the Court held that district courts must "maintain a balance between clearing . . . [their] calendars and affording litigants a

6

reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95–96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," defaults are "generally disfavored" and doubts should be resolved in favor of the defaulting party. Id. Furthermore, "[Rule 55(b)] states that a judgment by default 'may' be entered under specified circumstances, not that it must." Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (ordering an inquest to determine damages and stating that where the court enters a default judgment, it is required to "supervise [that entry] . . . with extreme care to avoid [a] miscarriage[] of justice"). Accordingly, plaintiffs are not entitled to a default judgment as a matter of right, simply because defendants Tavarez and Anderson are in default. Id.

The court has significant discretion and may consider a number of factors in deciding whether to grant a default judgment, including "'the amount of money potentially involved' (citation omitted) and 'whether the grounds for default are clearly established.'" Hirsch v. Innovation Int'l, Inc., WL 316143, at *2 (quoting Charles A. Wright, et al., 10 Fed. Practice and Procedure: § 2685, at 425-26 (2d ed. 1983)). The greater the amount of money involved, the more careful a court should be in entering a default judgment. See id. Additionally, a court may consider whether the facts alleged in the complaint state a valid cause of action, whether there are unresolved questions regarding material issues of fact as to liability or damages, whether plaintiff has been substantially prejudiced by the delay involved, and how harsh an effect a default judgment might have on the defendant. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981) (discussing factors); Charles A. Wright, et al., 10A Fed. Practice & Procedure, §§ 2685, 2688 (3d ed. 1998).

In this case, it is beyond dispute that defendants Tavarez and Anderson are in default

since the defendants failed to file an answer to plaintiffs' Complaints, and failed to challenge the Court's entry of a default. See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (holding that defendant's default was "crystal clear" as evidenced by its failure to oppose the plaintiff's motion for a default judgment).

## B. Plaintiffs' Claims

When a defendant defaults, the defendant is deemed to have admitted every well-pleaded allegation of the complaint, "except those relating to damages." See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65; Wing v. East River Chinese Rest., 884 F. Supp. 663, 669 (E.D.N.Y. 1995); Deshmukh v. Cook, 630 F. Supp. 956, 959 (S.D.N.Y. 1986). The Court, however, must review the allegations in the complaint to determine if the elements of each claim have been adequately pleaded. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65. In this case, although notice of the inquest hearing was sent to the defendants, they failed to appear or present evidence. Defendants Tavarez and Anderson have, therefore, conceded liability on those well-pleaded claims in the Complaints, and have not availed themselves of the opportunity to challenge the damages sought by plaintiffs.

### 1. Plaintiffs' Section 1983 Claims

Plaintiffs allege that "the decision of Tavarez, Anderson, and Figueroa to arrest them on January 5, 2009, for the felony of Criminal Sale of a Controlled Substance in the Third Degree, under New York Penal Law § 220.39, and to subsequently subject them to a malicious prosecution, violated their rights protected by the Fourth and Fourteenth Amendments to the

8

United States Constitution." (Berliner & Hall Decl. ¶ 7).

In order to prevail on a claim brought pursuant to 42 U.S.C. § 1983, a plaintiff must allege and prove: (1) that the defendant deprived him of a right guaranteed by the Constitution or laws of the United States; and (2) that the defendant acted under color of state law. See 42 U.S.C. § 1983; Gomez v. Toledo, 446 U.S. 635, 640 (1980); O'Neal v. County of Nassau, 992 F. Supp. 524, 531 (E.D.N.Y. 1997), aff'd, 133 F.3d 907 (2d Cir. 1998); Temple v. Albert, 719 F. Supp. 265, 266-67 (S.D.N.Y. 1989). Since Section 1983 applies only to conduct carried out under color of state law, there must be a showing that defendant was personally acting under color of law or in the case of a private individual, there must be proof that he "acted in concert with" or conspired with state actors to commit the violation. See Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 941 (1982); Hughes v. Patrolmen's Benevolent Ass'n, 850 F.2d 876, 880 (2d Cir.), cert. denied, 488 U.S. 967 (1988). Thus, "the question is whether 'the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the state.'" Fariello v. Rodriguez, 148 F.R.D. 670, 677 (E.D.N.Y. 1993), aff'd, 22 F.3d 1090 (2d Cir. 1994) (quoting Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir.), cert. denied, 506 U.S. 819 (1992)). In addition, there must be an allegation that the defendant was personally involved in or actually caused a deprivation of plaintiff's constitutional rights. See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1997), cert. denied, 434 U.S. 1087 (1978).

Plaintiffs have satisfied their burden to allege that defendants Tavarez and Anderson acted under color of state law based on their allegation that Tavarez and Anderson "were duly sworn police officers and were acting under the supervision of said department and according to

9

their official duties" and acted "under the color of state law" when they provided false information as a basis for plaintiffs' arrests. (J.C. Compl. ¶¶ 9, 40; M.C. Compl. ¶¶ 9, 40).

Plaintiffs allege that defendants Tavarez and Anderson deprived them of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983. (J.C. Compl. ¶ 41; M.C. Compl. ¶ 41). Plaintiffs allege a number of constitutional violations, including false arrest, unlawful search, excessive force, malicious abuse of process, malicious prosecution, and denial of constitutional right to a fair trial.

Before addressing plaintiffs' individual Section 1983 claims and in light of the fact that plaintiffs do not allege that the defaulting defendants were the arresting officers, but rather that they supplied false information to the arresting officers and to the District Attorney's office leading to their arrest and prosecution, the Court will address causation as a threshold issue. In "cases where the action of some other person occurs after the defendant's alleged misconduct but before the deprivation of liberty," usually "courts consider causation as a separate issue." Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir. 2000). The Supreme Court has noted that Section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Malley v. Briggs, 475 U.S. 335, 345 (1986) (holding that a judicial officer's decision to issue a warrant based on a police officer's insufficient affidavit did not break the "causal chain between the application for the warrant and the improvident arrest" in plaintiff's Section 1983 claim against the police officer). The Court need not determine whether the officers' alleged act of providing false information regarding the alleged activities of plaintiffs in the nightclub was itself a violation because the Court finds that plaintiffs' arrest and subsequent prosecution was a natural consequence of the defaulting defendants' actions.

10

The Court now considers plaintiffs' constitutional claims in turn.

### a. False Arrest

Plaintiffs allege that they were "subjected to an illegal, improper, and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, and confined without any probable cause, privilege or consent." (J.C. Compl. ¶ 46; M.C. Compl. ¶ 46). As a result of their arrests, plaintiffs claim that their "liberty was restricted for an extended period of time, [they] were put in fear for [their] safety and [they] were humiliated, without probable cause." (J.C. Compl. ¶ 47; M.C. Compl. ¶ 47).

A plaintiff claiming false arrest under Section 1983 must prove (1) that defendant intended to confine the plaintiff; (2) that the plaintiff was conscious of the confinement; (3) that the plaintiff did not consent to the confinement; and (4) that the confinement was not otherwise privileged. See Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1995); see also Rhodes v. City of Plattsburgh, 213 F.3d 626 (2d Cir. 2000). If probable cause exists for the arrest, the subsequent detention is considered "privileged" and no constitutional violation will be found. Shain v. Ellison, 273 F.3d 56, 67 (2d Cir. 2001). "[P]robable cause exists 'when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" Id. at 67-68 (quoting Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)); see also Dunaway v. New York, 442 U.S. 200, 208 n. 9 (1979). "Thus, if a police officer deliberately arrests someone without probable cause, he is liable under 42 U.S.C. § 1983. If, on the other hand, a police officer arrests someone with probable cause, but by mistake, there is no constitutional

11

violation." Ruiz v. Herrera, 745 F. Supp. 940, 946-47 (S.D.N.Y. 1990).

Here, plaintiffs allege that defendants Tavarez and Anderson intentionally provided false information to the arresting officer to effect their arrests without probable cause. Plaintiffs allege that Tavarez and Anderson fabricated information that plaintiffs were involved in a drug sale to undercover officers that never occurred, and that defendants' actions directly resulted in plaintiffs' arrest by Detective Carvajal. Under these circumstances, plaintiffs have met their burden of pleading and proving a Section 1983 claim of false arrest by defendants Tavarez and Anderson.

### b. Unlawful Search

Plaintiffs allege that following their unlawful arrest, they were unlawfully strip searched at the precinct in violation of their Fourth Amendment rights. (J.C. Compl. ¶¶ 50-51; M.C. Compl. ¶¶ 50-51). As plaintiffs' arrests were a foreseeable result of defendants Tavarez's and Anderson's actions, so was the strip search, which appears to have taken place incident to plaintiffs' booking at the police precinct in Queens. Therefore, the Court finds that plaintiffs have sufficiently pleaded their Section 1983 unlawful search claim.

### c. Malicious Prosecution

Plaintiffs allege that defendants misrepresented and falsified evidence and withheld exculpatory evidence from the District Attorney, while playing a direct and active role in the initiation of criminal proceedings against plaintiffs. (J.C. Compl. ¶¶ 64-70; M.C. Compl. ¶¶ 64-70). "Malicious prosecution occurs when '(1) the defendant initiated a prosecution against

12

plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor.'" Cameron v. City of New York, 598 F.3d 50, 63 (2d Cir. 2010) (citing Ricciuti v. N.Y. City Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)).

"Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments." Id. at 63 (citing Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997) (noting that where "there has been no indictment, a criminal action is commenced by the filing of an accusatory instrument, to wit, a 'felony complaint' for a felony charge, or a 'misdemeanor complaint' or an 'information' for a misdemeanor charge"); Lowth v. Town of Cheektowaga, 82 F.3d 563, 568, 571 (2d Cir. 1996) (finding that there was "no dispute as to the first . . . element[]" where the plaintiff "was immediately taken to the police station and was charged" by the defendant officer)); see also Murphy v. Lynn, 118 F.3d at 945 (holding that plaintiff was "seized" within the meaning of the Fourth Amendment where he was arrested without a warrant, spent the night in jail, and released following his arraignment and the filing of the accusatory instruments against him).

"[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior." Cameron v. City of New York, 598 F.3d at 63; see Zahrey v. Coffey, 221 F.3d at 352 (holding that "[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in

13

a deprivation of liberty"). "The prosecutor's actions do not supersede the complaining officer's actions; they only determine whether the officer's actions come to fruition – that is, whether the officer committed the tort of malicious prosecution, or merely attempted to prosecute maliciously." Cameron v. City of New York, 598 F.3d at 65; see also Ricciuti v. N.Y.C. Transit Auth., 124 F.3d at 130 (holding that "a jury could clearly find that [the police officer] started the assault prosecution because no one disputes that he started the prosecution by filing the charges of second-degree assault").

In order to succeed on a malicious prosecution claim, there must be a termination in favor of the plaintiff. "Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused." Murphy v. Lynn, 118 F.3d at 948. The types of dispositions not resulting from adjudication of the merits that have "generally been held not sufficiently favorable to the accused to be indicative of innocence" include "dismissals for lack of subject matter jurisdiction" and "dismissals pursuant to N.Y. Crim. Pro. L. § 170.30(1)(a) for failure to allege sufficient facts to support the charge." Id. (internal citations omitted). "The principal rationale is that dismissals of these types may not end the state's pursuit of the accused on the same charges, for a renewed prosecution may be commenced in a proper court on a facially sufficient pleading . . . . Similarly, dismissals by the prosecution 'in the interests of justice' under N.Y. Crim. Pro. L. § 170.40, are generally considered not to be dispositions in favor of the accused." Id. at 949. Moreover, a defendant's acceptance of an adjournment in contemplation of dismissal ("ACD") does not suffice to prove a favorable termination. Cardi v. Supermarket General Corp., 453 F. Supp. 633, 635 (E.D.N.Y. 1978).

14

Plaintiffs allege that the false information provided by defendants Tavarez and Anderson to other police officers and to the District Attorney resulted in the commencement of criminal proceedings against plaintiffs, including the filing of criminal charges for the sale of narcotics to a police officer. Plaintiffs allege that the charges were dismissed after six months, but do not indicate on what grounds the dismissal occurred. (J.C. Compl. ¶ 33; M.C. Compl. ¶ 33). Under these circumstances, where there is insufficient information to determine whether there was a "favorable termination," the Court finds that plaintiffs have failed to meet their burden to allege facts sufficient to plead their malicious prosecution claim against defendants Tavarez and Anderson.

### d. Malicious Abuse of Process

"[A] malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). "Malicious abuse of criminal process also supports liability under § 1983." Savino v. City of New York, 331 F.3d 63, 76-77 (2d Cir. 2003).

"The pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." Lopez v. City of New York, 901 F. Supp. 684, 691 (S.D.N.Y. 1995). "Moreover, the requirement of a collateral objective is not met merely by showing a malicious motive; there must be an improper purpose for the use of process, i.e. something other than the purpose for which the law created it." De Santis v. City of New York,

15

No. 10 Civ. 3508, 2011 WL 4005331, at *8 (S.D.N.Y. Aug. 29, 2011) (citations omitted) (dismissing plaintiff's malicious abuse-of-process claim where plaintiff failed to allege in his complaint that the detective "took any actions whatsoever following the issuance of process," such as economically harming, extorting, blackmailing, or coercing plaintiff); see also Savino v. City of New York, 331 F.3d 63, 77 (2d Cir. 2003) (holding that plaintiff's allegation that defendants were seeking to retaliate against him by pursuing his arrest and prosecution was insufficient to make out a claim for abuse of process, noting that he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution); Metals v. Firemen's Ins. Co. of Newark, N.J., 839 F.2d 42 (2d Cir. 1988) (finding no abuse of process where the defendant merely filed a counterclaim with the intent that the plaintiff expend money in defending the claim); Perry v. Manocherian, 675 F. Supp. 1417, 1429 (S.D.N.Y. 1987) (holding that issuance of a summons and complaint, even if made with the intent to coerce settlement and create bad publicity for the defendant, does not constitute abuse of process); Williams v. Williams, 23 N.Y.2d 592, 596, 298 N.Y.S.2d 473, 476, 246 N.E.2d 333, 335 (1969) (plaintiff's claim that an action was brought against him solely for the purpose of ruining his business reputation was insufficient to establish abuse of process).

Plaintiffs' Complaints state only that defendants arrested them "in order to obtain a collateral objective outside the legitimate ends of the legal process" and "with intent to do harm" to them "without excuse or justification." (J.C. Compl. ¶¶ 61-62; M.C. Compl. ¶¶ 61-62). The plaintiffs have not alleged facts sufficient to show that defendants' actions had a collateral purpose beyond or in addition to plaintiffs' prosecution. Therefore, the Court finds that they have failed to prove their claim of malicious abuse of process.

16

### e. Excessive Force

With regard to their Section 1983 excessive force claim, plaintiffs merely list the elements of the cause of action in their Complaint without asserting any facts that would plausibly support such a claim. (J.C. Compl. ¶¶ 56-58; M.C. Compl. ¶¶ 56-58). Plaintiffs allege only that they sustained "physical injuries," but they have not described the alleged "excessive force" used by officers in the course of their arrest. In addition, given plaintiffs' repeated assertions in their Complaints that they had no contact with defendants Tavarez and Anderson, it is unclear how these officers could have exerted any force against plaintiffs. Moreover, even if excessive force employed by other officers could be attributed to the defaulting defendants, the Complaints are devoid of any factual allegations relating to excessive force. Therefore, the Court finds that plaintiffs have failed to meet their burden to plead and prove a claim for excessive force.

### f. Failure to Intervene

Plaintiffs' fourth claim for relief alleges that defendants had an affirmative duty to intervene on their behalf to prevent the violation of their constitutional rights and that defendants failed to intervene on plaintiffs' behalf, resulting in the violation of their constitutional rights. (J.C. Compl. ¶¶ 52-55; M.C. Compl. ¶¶ 52-55).

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." Cicio v. Lamora, No. 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24,

17

2010). "To establish a claim of failure-to-intervene, the plaintiff must adduce evidence
establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2)
a reasonable person in the officer's position would know that the victim's constitutional rights
were being violated, and (3) that officer does not take reasonable steps to intervene." Henry v.
Dinelle, No. 9:10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (citations
omitted).

This claim provides alternative grounds for liability where plaintiff alleges that
defendant's inaction resulted in a violation of his constitutional rights. Where, as here,
defendants took affirmative steps to bring about the violation of plaintiffs' constitutional rights,
defendants are liable for their actions under Section 1983 and the Court need not consider
whether defendants may also be found liable under the alternative "failure to intervene" theory.[14]

### 2. Plaintiffs' State Law Claims

Plaintiffs have also alleged various claims under New York State law against the
defaulting defendants, including false arrest, false imprisonment, assault, battery, malicious
prosecution, malicious abuse of process, and intentional infliction of emotional distress.
However, since the measure of damages is the same under Section 1983 and under the state law
claims, and since the Court finds the measure of damages under Section 1983 sufficient to

---

[14]In their Complaints, plaintiffs set forth a claim for defendants' "denial of [plaintiffs']
constitutional right to fair trial" under the Due Process Clause of the Fifth and Fourteenth
Amendments of the United States Constitution. (See J.C. Compl. ¶¶ 75-79; M.C. Compl. ¶¶ 75-
79). As the criminal charges against plaintiffs were ultimately dismissed before trial, the factual
basis for plaintiffs' fair trial claim is unclear. Having found defendants liable on separate
grounds, the Court declines to consider this claim further.

18

compensate plaintiffs for their injuries, the Court has not addressed plaintiffs' state law claims.

## DAMAGES

A. Standards

It is well-established that unconstitutional conduct under the color of law that violates state law is redressable under Section 1983 of the Civil Rights Law, see Monroe v. Pape, 365 U.S. 167 (1961), overruled on other grounds, Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658 (1978), and that damage awards in such actions are "a vital component . . . for vindicating cherished constitutional guarantees." Owen v. City of Independence, 445 U.S. 622, 651, reh'g denied, 446 U.S. 993 (1980). Since damages for constitutional violations are "ordinarily determined according to principles derived from the common law of torts," Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986), there are three types of damages that, because they are available in tort actions, are available in Section 1983 cases – compensatory, nominal, and punitive damages.

In awarding compensatory damages, the Supreme Court has mandated that there be proof of actual injuries resulting from the deprivation of a constitutional right; damages may not be awarded based upon the abstract value of the right itself. See Carey v. Piphus, 435 U.S. 247, 266 (1978) (agreeing with plaintiffs that "the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights"); see also Memphis Community Sch. Dist. v. Stachura, 477 U.S. at 309. In the absence of evidence of actual injury, a court may award only nominal damages for a violation of a constitutional right. See Memphis Community Sch. Dist. v. Stachura, 477 U.S. at 308 n.11. However, where the

19

evidence shows that plaintiff's injuries were clearly caused by the violation, it is error to fail to award compensatory damages. See Atkins v. New York City, 143 F.3d 100, 103-104 (2d Cir. 1998).

Compensatory damages have been held to include not only actual, out-of-pocket losses, such as medical expenses and lost wages (both past and future), but also compensation for pain and suffering and mental or emotional distress. See Memphis Community Sch. Dist. v. Stachura, 477 U.S. at 307 (holding that compensatory damages may include damages for injuries such as "'impairment of reputation . . ., personal humiliation, and mental anguish and suffering'") (citations omitted). Damages under Section 1983 "are generally determined according to principles derived from the common law of torts." Wallace v. Suffolk County Police Dept., No. 04-CV-2599, 2011 WL 3625574, at *5 (E.D.N.Y. Aug. 15, 2011) (quoting BD v. DeBuono, 193 F.R.D. 117, 139 (S.D.N.Y. 2000)). "To recover compensatory damages, . . . a plaintiff must prove that his injuries were proximately caused by the constitutional violation." Id. (citing Gibeau v. Nellis, 18 F.3d 107, 110 (2d Cir. 1994)). The "damages recoverable . . . cannot be contingent, uncertain, or speculative; but if the fact is established that the plaintiff has sustained an actionable injury as the direct result of the defendant's wrongful act, reasonable certainty as to the amount of that injury is all that is required." Id. (quoting 36 N.Y. Jur. 2d Damages § 17).

## B. Plaintiffs' Evidence in Support of Damages

In seeking damages for the violation of their constitutional rights, the plaintiffs have requested the following categories of damages: lost earnings, reimbursement of the amounts paid toward the purchase of the Plaza Meat Market, lost profits, emotional pain and suffering,

and attorney's fees and costs incurred in connection with this action. Both plaintiffs presented testimony at the inquest hearing held on October 27, 2010 and submitted certain documents in support of their request.

Jose Colon testified that he was 24 years old at the time of the incident on January 5, 2008. (Tr.[15] at 6). He grew up in the Dominican Republic, spending several months each year in New York. (Id. at 7). He attended college at the Pontificio Universidad Catolica, Madre & Maestra, studying business administration, but left before completing his last semester to set up a business in New York. (Id. at 7, 9). He has a three-year-old child in the Dominican Republic, who he has never seen because of his arrest in this case, and his relationship with the child's mother also ended as a result of his unlawful arrest. (Id. at 8).

He testified that as a child, he would spend time with his father, in his father's five grocery stores in Brooklyn, eventually working as a cashier with the responsibility of putting price stickers on products. (Id. at 9-10). His father sold the stores in 2000, and set up an auto repair shop in Santo Domingo, but plaintiff continued to work summers at his uncle's grocery stores in New York. (Id. at 10-11).

In December 2007, he and his brother, Maximo, purchased a grocery store between 80th and 81st Streets on 31st Avenue in Elmhurst, Queens. (Id. at 12). Plaintiff described the area as a "very calm area with lots of houses." (Id.) He had become familiar with this particular store because his uncle had a home nearby. (Id.) When he saw the store was up for sale, he spent a month studying the store and determined that it had "good sales" that would cover expenses. (Id.

_____

[15]Citations to "Tr." refer to the transcript of the inquest hearing held on October 27, 2010.

21

at 12-13). He testified that the store was making, on average, $13,000 a week in 2007. (Id. at 13).

In December 2007, he purchased the store in the name of Colon Espinal Corporation for the sum of $225,000. (Id. at 14). He signed the purchase agreement as a personal guarantor of the lease and the purchase of the business. (Id. at 30). He did not purchase the building where the store was located; instead, he paid rent for the building plus a monthly fee to purchase the business. (Id. at 14). The down payment was $54,000 and he later paid another $25,000, plus a monthly fee of $6,000 for the business. (Id. at 15). He also testified that he paid a monthly rent toward the lease of the building at the rate of $1,700 a month.[16] (Id. at 31). According to plaintiff, the down payment came from an inheritance left by his father upon his death in 2005. (Id. at 15)

On January 5, 2008, approximately fifteen days after purchasing the business, he and his brother were arrested. (Id. at 16). That night, he was in a bar drinking beer with his brother and some friends when he and his brother were placed under arrest. (Id. at 17). He was later informed by his attorney that he had been arrested and charged in connection with a drug sale, which he denied, and he was held in custody for approximately 36 hours. (Id. at 16-17). Following his release, Mr. Colon went back to the bar to retrieve a videotape that showed, contrary to the officers' allegations, that at no time did plaintiffs have any contact with the

---

[16]Although Jose Colon initially testified that rent was $1,300 per month (Tr. at 15), he later corrected himself, stating that rent was $1,700. (Id. at 31). The larger figure is more consistent with the documentation plaintiffs submitted in support of their damage calculations. (Pls.' Stmt. of Damages, Ex. 3).

22

officers prior to the arrest, thus negating any claim that they sold drugs to the officers. (Id. at 19). Subsequently, he paid $2,500 to bail his older brother, Maximo, out of jail. (Id. at 33).

In June 2008, roughly six months after plaintiffs were arrested, the criminal charges were dismissed. (Id. at 19-20). During this period, Mr. Colon was attempting to obtain licenses for the store, to enable him to sell alcohol, cigarettes, and lottery tickets. (Id. at 20). He was informed that because he had a pending drug case, the State of New York would not issue him a license for any of these items. (Id.) Even though there was a lottery machine in the store when he purchased the store, it was removed at some point while the case was pending. (Id. at 21). Similarly, he was able to sell cigarettes for a time under the license of the prior owner, but approximately three months after the purchase of the business, the store lost the ability to sell cigarettes and alcohol. (Id. at 21-22).

Plaintiff testified that when he could no longer sell cigarettes, beer, and lottery tickets, he began having problems paying the rent and he realized that he was going to have to sell the store. (Id. at 22). His brother, Maximo, was his partner and they split the bills between them. (Id. at 23). He testified that he worked at the store eight or nine hours a day, opening at 7:00 a.m. and closing around 10:00 or 11:00 at night. (Id. at 18). He testified that the store was open seven days a week and there were two employees earning $350 and $400 per week. (Id. at 18-19). He testified that when they fell behind on paying the rent, the landlord shut the gates and replaced the padlock. (Id. at 27). As a result, they lost all the equipment in the store, and with the store closed, all the inventory in the refrigerators and freezers was damaged. (Id. at 32). He testified that he owes $3,000 to suppliers, plus three months' rent. (Id. at 27-28). Plaintiff testified that

his brother, mother, aunt and uncle help in supporting him, but he still owes money to the former owner of the store. (Id. at 26).

Since the store closed, he has been having trouble getting work. (Id. at 25). People who could give him work no longer speak to him. Once potential employers ask if he has ever been arrested, they then will not hire him. (Id.) He did work for a cleaning company for eight months, getting paid $700 to $800 every two weeks. (Id. at 25-26).

Jose Colon also testified that he had suffered emotional distress because the arrest had prevented him from seeing his young daughter and caused his relationship with her mother to end. (Id. at 24). He also expressed feelings of nervousness whenever he sees a police officer and noted that many neighbors and acquaintances have distanced themselves from plaintiffs after the arrest. (Id.) He testified that he has had trouble sleeping and his blood pressure has been affected by the fact that he is nervous and not sleeping. (Id.)

Maximo Colon testified that he was arrested for drug sales and paid his criminal lawyer $5,000 to represent him. (Id. at 34). He confirmed that it took approximately six months to have the charges dismissed, during which time the brothers lost the business. (Id. at 35). He testified that he spent approximately 48 hours in custody and was released from Rikers Island. (Id.) After the store closed, Maximo worked for two-and-a-half months in his cousin's store in Philadelphia, earning $400 per week. Since the commute was too far, the arrangement was only temporary. (Id. at 39).

He confirmed that what Jose had said about the loss of the business was accurate but he emphasized that the arrest also impacted the brothers' reputation in this Hispanic neighborhood. (Id. at 36). Women who lived in the neighborhood and who would shop in the store saw

24

newspaper articles about the drug arrest and would no longer allow their children to make purchases in the store or purchase items themselves. (Id.) He testified that people believed the brothers were selling drugs out of the store. (Id. at 37). He also testified that he barely sleeps, fears the police, and many of his friends maintain their distance even though they know he was innocent simply because he had a problem with the police and his friends fear retaliation for their association with him. (Id.)

Maximo, who was 26 at the time of the arrest, explained that he also suffered physical injuries during the arrest. (Id. at 38). He was hit in the knee and dislocated his right wrist, but never received treatment for either injury. (Id.)

### 1. Lost Wages

In their Statement of Damages, plaintiffs seek several categories of compensatory damages, including (1) lost store profits, totaling $53,000 annually after wages paid; and (2) payments made and amounts due and owed by plaintiffs in connection with the purchase of the business, totaling $250,000.[17] (Pls.' Stmt. of Damages[18] at 1-2).

With respect to plaintiffs' request for lost earnings and losses due to the failure of the business, plaintiffs have submitted an analysis prepared by Francis DeVito, an accountant,

---

[17]In plaintiffs' papers, they request a total of $1,620,467.72, consisting of the purchase price of the business, estimated future lost earnings for the business, and attorney's fees and costs. (See Pls.' Stmt. of Damages at 2). This figure does not include any amount for emotional distress damages, time spent in custody, or punitive damages. Plaintiffs "request that the Court determine an appropriate compensation for their pain and suffering." (Id.)

[18]Citations to "Pls.' Stmt. of Damages" refer to Plaintiffs' Statement of Damages and Supporting Documentation, filed October 8, 2010.

calculating the losses due to the business as a result of the arrest of the brothers. (Id., Ex. 1).
Having reviewed the evidence and the expert's report, and having considered the testimony of
the plaintiffs, the Court finds that there is sufficient factual basis to award plaintiffs damages
based on the failure of the business. The Court finds that there is a clear causal relationship
between plaintiffs' incarceration and their resulting inability to receive their liquor and cigarette
licenses and their inability to obtain a lottery license. Plaintiffs have presented the legal authority
which supports their claim that the State of New York is unwilling to issue such licenses while
an individual is facing criminal charges. (Id., Ex. 6). Moreover, based on the plaintiffs'
testimony, it appears that a significant portion of the store's revenue is derived from sales of beer,
cigarettes and lottery tickets. Thus, the inability to obtain the required licenses had a direct
impact on the store's profitability and its ultimate failure.

The Court further credits the plaintiffs' testimony that business dropped off following
their arrest due to the concern in the neighborhood that drugs were being sold out of the store.
Certainly the publicity regarding the Colon brothers' arrests could have negatively impacted the
fledgling store's ability to generate income and may have, in conjunction with the lack of
licenses, led to its ultimate demise. Indeed, although Jose Colon testified that he had studied the
finances of the store in the month prior to its purchase and determined that it earned
approximately $13,000 per week, there is no evidence before the Court as to what percentage of
those sales was based on sales of beer, cigarettes and lottery tickets. Given the amounts owed for
rent on the building ($1,700 a month) and owed to the seller as monthly installments on the
purchase price of the business ($6,167), any significant drop off of business could adversely
affect the viability of the store.

26

The Court further credits the testimony of Jose Colon that he paid roughly $1,700 per month in rent, for a total of $5,100.00 for the three months the store was open. Plaintiffs have provided a "Five (5) Day Commercial Notice" for the rent owed to the landlord of the commercial premises where the store was located. (See Pls.' Stmt. of Damages, Ex. 3). The document indicates that, as of June 27, 2008 a total of three months' rent at $1,772.63 per month was owed, for a total of $5,317.89. Finally, the testimony supports an award of $3,000 owed to suppliers.

Accordingly, the Court respectfully recommends that plaintiffs be awarded damages in the amount of $250,000, representing the money plaintiffs paid and currently owe toward the purchase price of the business, plus $10,417.89, representing rent plaintiffs paid and currently owe to the landlord for the three months that the store was open and the three months after it closed, plus $3,000 for money owed to suppliers, for a total of $263,417.89.

With respect to plaintiffs' request for anticipated lost profits amounting to $53,000 per year, the Court has examined the analysis prepared by Francis DeVito, a Certified Public Accountant with the firm of DeVito, Snowden, Witanek & Co., LLC, and finds it insufficiently detailed to determine whether the analysis is appropriate. According to the May 25, 2010 letter prepared by Mr. DeVito, he examined the tax returns filed by the store's prior owner, along with "accounting records, purchase agreements, and corporate board minutes." (Pls.' Stmt. of Damages, Ex. 1 (DeVito Report)). In essence, Mr. DeVito examined the tax returns for 2007 and 2006 and extrapolated the net profit of the store for those years. (DeVito Report, Ex. C). From the Exhibit attached to the letter, it appears that in 2006, the accountant determined that out of total sales of $312,225, deducting for expenses, including non-owner wages, the total return to

27

the owner was $23,962. (Id., Ex. C). In 2007, sales were down to $230,414, with the total return to the owner reduced to $13,766. (Id., Ex. C). Thus, after deducting the owner's salary, which was $19,800 in 2006 and $11,700 in 2007, the net profit for the business was $4,162 in 2006 and $2,066 in 2007. (Id., Ex. C).

In Exhibit F to the accountant's letter, he projected that sales for the year 2008 would grow to $676,000, with the total return to the owners of $137,183. The only explanation for the difference between the year 2008 and the prior two years is the accountant's statement that: "It appears that the prior owner might not have been reporting the entire store's sales. This is demonstrated by the total return to owner of $13,766 for 2007 and $23,962 for 2006." (Id. at 2, Exs. C, F). However, according to the accountant's letter, the only evidence cited to support the inference of under-reporting by the prior owner is the fact that in the New York Lottery Sales Retailer Application filed by Jose Colon, weekly store sales of $13,000 per week are reported. (Id., Ex. D). Not only is this application filed by one of the plaintiffs and not by the prior owner, but there is no explanation as to why the accountant concluded that the accurate number was the number reported on the Lottery application and not on the tax returns. Similarly, to the extent that there is an assumption that the prior owner, who drew up the terms and conditions of the sale, knew that $100,800 of debt service was required for one year of the purchase is an assumption for which the accountant has provided limited explanation and support.

Given that the store was newly opened under the Colons' ownership, with no track record other than that of the prior owner, and based on the declining number of sales as demonstrated by the prior two years, the Court respectfully recommends that plaintiffs not be awarded any lost profits at this time.

28

## 2. Emotional and Psychological Injuries

In addition, plaintiffs seek emotional distress damages and pain and suffering, as well as compensation for the time spent by each plaintiff in prison as a result of their wrongful arrest. With respect to plaintiffs' claim for emotional distress damages and pain and suffering, the plaintiffs have presented the reports of psychologist Marc Janoson, Ph.D., who examined both Jose Colon and Maximo Colon on four occasions, rendering reports dated September 24, 2009. (Pls.' Stmt. of Damages, Ex. 1). Both plaintiffs were diagnosed with major depressive disorder, single episode, Moderate – Severe and acute post-traumatic stress disorder. (See id.) In addition, plaintiff Maximo Colon complains of bruises and minor physical injuries as a result of the arrest. (Id.) Plaintiffs also seek monetary compensation for the time spent in custody: Jose spent 36 hours in custody and Maximo spent 48 hours in custody. Based on the Court's knowledge of settlements and verdicts in similar cases involving false arrest and false imprisonment, and given the egregious conduct of the defaulting defendants, the Court respectfully recommends that plaintiff Jose Colon be awarded $50,000 in emotional distress damages and that Maximo Colon be awarded $65,000 in emotional distress damages and pain and suffering.

## 3. Punitive Damages

Although punitive damages may not be awarded against a municipality for Section 1983 violations, see City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981), punitive damages may be awarded against a state or local official acting in an individual capacity. See Smith v. Wade, 461 U.S. 30 (1983). The Court in Smith held that punitive damages may be assessed against an individual "when the defendant's conduct is shown to be motivated by evil motive or

29

intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. at 56. Unlike compensatory damages, which must be awarded to compensate a plaintiff for his or her loss, punitive damages are discretionary and may be awarded where the trier of fact finds that such an award serves the purpose of punishment or deterrence. See id. at 52; McFadden v. Sanchez, 710 F.2d 907, 913 (2d Cir.), cert. denied, 464 U.S. 961 (1983). As the court in Mathie v. Fries noted: "[t]he purpose of punitive damages is to punish the defendant and to deter him and others from similar conduct in the future." 935 F. Supp. 1284, 1307 (E.D.N.Y. 1996) (citing Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991); Vasbinder v. Scott, 976 F.2d 118 (2d Cir. 1992)). Under Smith, courts have held that an award of punitive damages is appropriate where it has been shown that the "defendant actually derive[d] satisfaction from hurting the plaintiff" or if "defendant, while not having any particular desire to hurt the plaintiff, trample[d] on the plaintiff's rights, in a fashion that can fairly be called reckless, to accomplish his own aims." Soderbeck v. Burnett County, 752 F.2d 285, 289 (7th Cir.), cert. denied, 471 U.S. 1117 (1985).

However, the mere fact that a defendant may have engaged in intentional conduct is not sufficient to justify an award of punitive damages. See Hernandez - Tirado v. Artau, 874 F.2d 866, 868 (1st Cir. 1989). Instead, "an award of punitive damages requires an assessment of [defendant's] subjective state of mind" to determine whether the defendant knew that his conduct was unconstitutional or that defendant was callously indifferent to plaintiff's rights. Wulf v. City of Wichita, 883 F.2d 842, 867 (10th Cir. 1989).

In determining what constitutes a reasonable award of punitive damages, the Second Circuit has held that an award of punitive damages should not result in defendant's financial ruin

30

or constitute a disproportionate percentage of his net wealth. See Vasbinder v. Scott, 976 F.2d at 121. Thus, punitive damage awards have been reduced where the amount is so excessive in comparison to the defendant's net wealth that it shocked the conscience of the court. See id.

A review of the punitive damage awards in Section 1983 cases demonstrates that the size of the award varies with the severity and egregiousness of the conduct involved. Thus, in Mathie v. Fries, the plaintiff was initially awarded $500,000 in punitive damages based on defendant's use of his position "to victimize and forcibly sodomize an inmate under his total control in an outrageous abuse of power and authority," 935 F. Supp. at 1306-07. This award was eventually reduced on appeal, resulting in an ultimate award of $200,000 in punitive damages. See Mathie v. Fries, 121 F.3d 808 (2d Cir. 1997); see also Lee v. Edwards, 101 F.3d 805, 813 (2d Cir. 1996) (reducing $200,000 punitive damages award to $75,000 based on comparison of the ratio of compensatory to punitive damages and other similar awards); King v. Macri, 993 F.2d 294 (finding that aggregate punitive damages awards of $175,000 and $75,000 against court security officers were excessive and ordering new trial unless plaintiff agreed to reduced verdicts of $100,000 and $50,000, respectively); Posr v. Doherty, 944 F.2d 91, 95 (2d Cir. 1991) (awarding $10,000 in punitive damages for excessive force plus $10,000 for false arrest); Ismail v. Cohen, 899 F.2d 183 (2d Cir. 1990) (awarding $150,000 in punitive damages for false arrest and excessive force); Jackson v. Crews, 873 F.2d 1105 (8th Cir. 1989) (awarding $50,000 in punitive damages for excessive force); Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir.) (awarding punitive damages of $819,983 for brutal beating by police officers resulting in death or serious injury), cert. denied, 493 U.S. 820 (1989); Hughes v. Patrolmen's Benevolent Ass'n., 850 F.2d 876, 883 (2d Cir. 1988) (awarding total of $350,000 in punitive damages); O'Neill v. Krzeminski, 839

31

F.2d 9, 13-14 (2d Cir. 1988) (awarding $185,000 in punitive damages even though no permanent injuries or emotional distress resulted where police officers beat the victim while in handcuffs); Garrick v. City & County of Denver, 652 F.2d 969 (10th Cir. 1981) (awarding $70,000 in punitive damages for excessive force in the shooting of plaintiff after traffic stop); Nieman v. Whalen, 928 F. Supp. 296 (S.D.N.Y. 1996) (finding that the jury's award of $200,000 in punitive damages assessed against a police officer who coerced a confession from plaintiff was so great as to shock the judicial conscience, and reducing the award to $40,000, which would "serve the goals of punishment and deterrence"), aff'd, 107 F.3d 3 (2d Cir. 1997).

Given the egregious nature of the individual defendants' conduct, the Court would normally assess punitive damages; however, since plaintiffs have provided no information regarding defendants' ability to pay, the Court declines to recommend an award of punitive damages at this time.

## C. Effect of Settlement

Plaintiffs settled this matter with defendant Figueroa, from whom both plaintiffs received $166.66, and with the City of New York, from whom both plaintiffs received $150,000. (Berliner & Hall Decl. ¶¶ 4, 5). Ms. Berliner explains that of the amounts received, she paid a total of $93,148.70 to Jose Colon. (Id. ¶ 5). Ms. Hall explains that of the amount received, she paid a total of $93,148.70 to Maximo Colon. (Id.)

The question is whether these amounts should be set off against the amounts recommended by the Court in calculating plaintiffs' damages. As an initial matter, the Court

32

notes that there is a split of authority as to whether a defaulting defendant is entitled to a set-off. Federal common law permits a set-off where a jointly liable co-defendant has settled, see McDermott v. AmClyde, 511 U.S. 202, 211 (1994), but in Chloe v. Zarafshan, the court held that a defendant in default "may not invoke the benefits of the set-off rule." No. 1:06–cv–03140, 2009 WL 2956827, at *7 (S.D.N.Y. Sept. 15, 2009); see also RLI Ins. Co. v. King Sha Group, 598 F. Supp. 2d 438, 446-47 (S.D.N.Y. 2009) (holding that under New York law, a defaulting defendant is not entitled to a set-off based on a co-defendant's settlement); but cf., State Farm Mut. Auto Ins. Co. v. Kalika, No. 04-CV-4631, 2007 WL 4326920, at *9 (E.D.N.Y. Dec. 7, 2007) (reducing a default judgment based on a settlement by other co-defendants but without discussing the set-off rule).

In this case, the Court makes no recommendation as to whether or not there should be a set-off when a defendant defaults as in this case. However, here, plaintiffs have not been given an opportunity to address the question of set-off and although the defendants have been given numerous opportunities in this case to be heard, they have declined to participate. Accordingly, in the absence of input from either party, the Court respectfully recommends that no set-off be implemented at this time, but that the denial of a set-off be without prejudice. Although the Supreme Court in McDermott stated that "it is generally agreed that when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement," the Court also stated that "[t]he law contains no rigid rule against overcompensation." 511 U.S. at 208, 219. Here, because the Court finds that the conduct of the defaulting defendants was particularly egregious and harmed the plaintiffs' business and futures in ways in which it is difficult to calculate the losses, the need to off-set the settlement received

33

from the damages found by the Court is less compelling.


## D. Attorney's Fees and Costs

Plaintiffs move for an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988. In support, plaintiffs have submitted a declaration of their counsel, Rochelle S. Berliner and Christina A. Hall, detailing their qualifications and experience, the hours expended in prosecuting plaintiffs' claims, and the expenses and costs incurred in connection with this action. In total, plaintiff Jose Colon seeks an award of fees of $53,725 for 153.5 hours of attorney time, and $4,876.43 in costs and disbursements. Plaintiff Maximo Colon seeks an award of fees of $39,725 for 113.5 hours of attorney time, and $3,066.51 in costs and disbursements. Both plaintiffs represent that their fee requests do not include time spent working on matters relating solely to the litigation against the non-defaulting defendants.


### 1. Attorney's Fees

#### a. Standards

Section 1988 provides that the "prevailing party" in any action to enforce civil rights provisions, including 42 U.S.C. §§ 1983 and 1985, may recover reasonable attorney's fees. 42 U.S.C. § 1988. A plaintiff is considered a "prevailing party" for purposes of Section 1988 if he "established his entitlement to relief on the merits of his claims, either in the trial court or on appeal." Hanrahan v. Hampton, 446 U.S. 754, 757 (1980); see also Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (holding that a plaintiff becomes a prevailing party if he succeeds on "any significant issue in litigation which achieves some of the benefits the part[y] sought in bringing

34

suit"). However, "[n]othing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." Maher v. Gagne, 448 U.S. 122, 129 (1980) (noting that "[t]he fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees"). Here, because defendants Tavarez and Anderson have defaulted, plaintiffs' claims on liability are established and Jose and Maximo Colon are clearly "prevailing parties" for purposes of awarding attorney's fees.

It is clear that the fee applicant bears the "burden of establishing entitlement to [a fee] award" under Section 1988. Hensley v. Eckerhart, 461 U.S. 437. This includes submitting evidence not only to support the number of hours worked, see id. at 433, but also to demonstrate the reasonableness of the hourly rate requested by producing evidence that the rate requested is the prevailing market rate. See Blum v. Stenson, 465 U.S. 886, 895-96 (1984). A plaintiff may also, as here, seek to recover fees for the time expended by the attorney in preparing the fee application. See Valley Disposal, Inc. v. Central Vermont Solid Waste Mgmt. Dist., 71 F.3d 1053, 1059 (2d Cir. 1995). In evaluating such fee requests, the district judge is afforded broad discretion and great leeway. See id.

In Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany and Albany County Board of Elections, 522 F.3d 182, 183-84 (2d Cir. 2008), the Second Circuit "'abandon[ed]' the 'lodestar' approach to awarding attorney's fees," Simmons v. New York City Transit Auth., 575 F.3d 170, 175 (2d Cir. 2009), and held that when assessing whether claimed legal costs are reasonable, the Court determines the "presumptively reasonable fee" for an attorney's services by looking to what a reasonable client would be willing to pay, "'bear[ing] in

35

mind *all* of the case-specific variables'" that the courts have identified as relevant in setting a

reasonable hourly rate. Id. at 172 (quoting Arbor Hill Concerned Citizens Neighborhood Ass'n v.

County of Albany, 522 F.3d at 190) (emphasis in original).

In order to calculate the presumptively reasonable fee, the court must first determine a

reasonable hourly rate for the legal services performed. Id. The Second Circuit has adopted the

following factors, inter alia, to guide the court's inquiry as to what constitutes a reasonable

hourly rate:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the
> level of skill required to perform the legal service properly; (4) the preclusion of
> employment by the attorney due to acceptance of the case; (5) the attorney's
> customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time
> limitations imposed by the client or the circumstances; (8) the amount involved in the
> case and the results obtained; (9) the experience, reputation, and ability of the
> attorneys; (10) the "undesirability" of the case; (11) the nature and length of the
> professional relationship with the client; and (12) awards in similar cases . . . .

Id. at 187 n.3 (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.

1974), abrogated on other grounds by Blanchard v. Bergeron, 489 U.S. 87 (1989)). The Supreme

Court in Hensley v. Eckerhart referred to these same factors in setting out "the general approach

that district courts should follow in determining what amount constitutes a 'reasonable' fee

within the meaning of § 1988 and other federal fee-shifting statutes." Orchano v. Advanced

Recovery, Inc., 107 F.3d 94, 97-98 (2d Cir. 1997) (citing Hensley v. Eckerhart, 461 U.S. at 429-

30). In addition, a number of recent cases have applied some of these Arbor Hill factors when

awarding attorney's fees. See Vilkhu v. City of New York, No. 06 CV 2095, 2009 WL 1851019

(E.D.N.Y. 2009); see also Cruz v. Henry Modell & Co., Inc., No. 05 CV 1450, 2008 WL 905351,

at *3 (E.D.N.Y. 2008).

36

Courts are also instructed to balance:

> the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively . . ., the timing demands of the case, whether the attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether the attorney might have initially acted pro bono . . ., and other returns (such as reputation, etc.) the attorney might expect from the representation.

Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d at 184.

In determining the appropriate rate to be charged, the Second Circuit has indicated that courts may consider evidence of prevailing rates for similar services beyond the fee application itself. See Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1059 (2d Cir. 1989). In addition to the parties' evidentiary submissions, the Court may consider its own experience and familiarity with the case and with rates generally charged. See Cruz v. Local Union No. 3, 34 F.3d at 1160 (noting that "[a] district court's 'choice of rates [is] well within [its] discretion'") (quoting Cabrera v. Jakobovitz, 24 F.3d 372, 393 (2d Cir. 1994), cert. denied, 513 U.S. 876 (1994)). To "inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. at 896 n.11.

Indeed, the Second Circuit has held that in calculating the presumptively reasonable fee, "courts 'should generally use the hourly rates employed in the district in which the reviewing court sits.'" Simmons v. New York City Transit Auth., 575 F.3d at 174 (holding that when awarding attorney's fees, there is a presumption in favor of relying on the rates where the case is

37

litigated, not where the attorneys are located) (citations omitted).

Following the decision in Simmons, rates of $300 to $400 per hour for partners have been considered reasonable in the Eastern District. See, e.g., Gutman v. Klein, No. 03 CV 1570, 2009 WL 3296072, at *3 (E.D.N.Y. Oct. 13, 2009) (awarding attorney's fees due to spoliation of evidence). See also Blue Moon Media Group, Inc. v. Field, No. CV 08-1000, 2011 WL 4056068, at *13 (E.D.N.Y. Apr. 11, 2011) (reducing rate of partner to $400 per hour and rate of associates to $175 to $325 per hour); BBY Solutions, Inc. v. Schwartz, No. CV 11-0947, 2011 WL 6986937, at *7 (E.D.N.Y. Nov. 17, 2011) (limiting rate of partners to $400 and approving rates of associates ranging from $150 to $310 per hour, based on years of experience); Melnick v. Press, No. 06-CV-6686, 2009 WL 2824586, at *9 (E.D.N.Y. Aug. 28, 2009) (holding that rates in the Eastern District vary from $200 to $375 per hour for partners and $100 to $295 per hour for associates); Moran v. Sasso, No. 05 CV 4716, 2009 WL 1940785, at *4 (E.D.N.Y. July 2, 2009) (stating that in the Eastern District of New York, reasonable hourly rates have ranged from $200 to $350 for partners and $200 to $250 for senior associates); Rodriguez v. Pressler & Pressler, LLP, 06 CV 5103, 2009 WL 689056, at *1 (E.D.N.Y. Mar. 29, 2009) (holding that hourly rates of $450 and $300 were reasonable for a Fair Debt Collection Practices Act case).

### b. Rates Requested

In support of plaintiffs' request for attorneys' fees and costs, Rochelle Berliner and Christina A. Hall submitted a joint motion for attorneys' fees with time sheets representing the work they did on plaintiffs' cases. (Berliner & Hall Decl., Exs. 2, 4). Ms. Berliner and Ms. Hall represent that they "worked together as a team in preparing the case, the legal arguments that

arose each step of the way, the damages report and the default inquest" and that they "attempted, as best [they] could, to avoid duplication of work effort and instead concentrate on [their] particular areas of expertise in achieving the results in this case." (Berliner & Hall Decl. at 11).

Exhibit 2 to the attorneys' Declaration includes an itemized list of hours spent by Ms. Hall working on Maximo Colon's case and the description of work completed. Ms. Hall explains that she has represented Maximo Colon since he first consulted her in April 2008. (Berliner & Hall Decl. at 1). According to Ms. Hall, she "focused her energies upon the financial losses incurred by Plaintiffs as a result of their false arrest and malicious prosecution." (Id. at 11). Hall, who has a "financial background in business contracts and sales" and "own[s] her own business," "worked closely with the Plaintiffs and their business lawyer" to "prepare[] the damages report . . . almost entirely on her own." (Id.) Ms. Hall has twenty-one years of experience as a solo practitioner focusing on cases involving the civil rights of immigrants. (Id. at 15). She has "tried many cases in both state and federal court" (id.), and she bills at a rate of $350 per hour. (Id. at 8).

Exhibit 4 to the attorney's Declaration includes an itemized list of hours spent by Ms. Berliner working on Jose Colon's case and the description of work completed. Ms. Berliner explains that she was first consulted by Jose Colon in January 2008. (Id. at 1). In representing her client, Ms. Berliner focused on various legal issues in this case. For example, she worked with a forensic psychologist in determining damages incurred for pain and suffering. (Id. at 11). She also conducted legal research on issues such as qualified immunity, default judgments, and the City's motion to dismiss. (Id.) Although Ms. Berliner is a seasoned criminal lawyer and has been practicing for roughly twenty years, she only began her civil rights practice in 2006. (Id. at

39

15). Ms. Berliner also bills at a rate of $350 per hour. (Id. at 8).

Given the cases in this district that have approved reasonable partner rates of between
$300 and $400 per hour, and in light of Ms. Hall's and Ms. Berliner's level of experience
litigating civil rights cases, the Court finds that the rates requested for Ms. Hall's and Ms.
Berliner's work are reasonable.

### c. Hours Billed

Turning to the number of hours billed for this matter, plaintiff Jose Colon seeks a total
award of $53,725.00 in fees, representing 153.5 hours over the period from March 2008 through
August 2011. (Berliner & Hall Decl., Ex. 2). Plaintiff Maximo Colon seeks a total award of
$39,725.00 in fees, representing 113.5 hours over the period from April 2008 through August
2011. (Berliner & Hall Decl., Ex. 2).

In reviewing a fee application, the court "should exclude excessive, redundant or
otherwise unnecessary hours." Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999)
(citing Hensley v. Eckerhart, 461 U.S. at 433–35); see also Rotella v. Board of Educ., No. CV
01–0434, 2002 WL 59106, at *3–4 (E.D.N.Y. Jan. 17, 2002) (applying percentage reduction to
fees of several attorneys for excessive and redundant billing); Quinn v. Nassau City Police Dep't,
75 F. Supp. 2d 74, 78 (E.D.N.Y. 1999) (reducing one attorney's fees by 20% and another by 30%
for unnecessary and redundant time); Perdue v. City Univ. of N.Y., 13 F. Supp. 2d 326, 346
(E.D.N.Y. 1998) (imposing a 20% reduction for redundancy); American Lung Ass'n v. Reilly,
144 F.R.D. 622, 627 (E.D.N.Y. 1992) (finding that "the use of so many lawyers for relatively
straightforward legal tasks was excessive and led to duplication of work," and deducting 40% of

40

plaintiffs' hours).

Similarly, courts routinely apply across-the-board reductions for vague entries, see, e.g., In re Olson, 884 F.2d 1415, 1428–29 (D.C. Cir. 1989) (reducing fees based on lack of specificity in description of work performed); DeVito v. Hempstead China Shop, Inc., 831 F. Supp. 1037, 1045 (E.D.N.Y. 1993) (reducing fee request by 40% for, inter alia, insufficient descriptions of work performed), rev'd & remanded on other grounds, 38 F.3d 651 (2d Cir. 1994); Cabrera v. Fischler, 814 F. Supp. 269, 290 (E.D.N.Y. 1993) (reducing fees by 30% for vague entries with insufficient descriptions of work performed), rev'd in part & remanded on other grounds, 24 F.3d 372 (2d Cir.), cert. denied, 513 U.S. 876 (1994); Nu-Life Construction Corp. v. Board of Educ., 795 F. Supp. 602, 607–608 (E.D.N.Y. 1992) (reducing fees by 30% due in part to lack of specificity in descriptions of work performed); Meriwether v. Coughlin, 727 F. Supp. 823, 827 (S.D.N.Y. 1989) (finding an overall reduction of 15% warranted based on vague descriptions of work performed), or for redundant and excessive billing).

According to Ms. Berliner's time sheets, she spent time preparing and serving the summons and Complaints,[19] meeting with Ms. Hall and her client, Jose Colon, and preparing the default and inquest papers, and appearing for the inquest hearing, which took approximately two hours. (Berliner & Hall Decl., Ex. 4). Although the 23-page complaints filed in plaintiffs' cases lack detail and are almost identical, Ms. Berliner spent a total of 18.25 hours preparing and serving the summons and Complaints. (Id.)

According to Ms. Hall's time sheets, she spent time working on matters related to the

---

[19]Although Ms. Berliner was retained by Jose Colon, she appears to have drafted the Complaints for both plaintiffs. (Berliner & Hall Decl., Ex. 4).

41

computation of damages stemming from plaintiffs' business losses, meeting with Ms. Berliner, meeting with her client, Maximo Colon, preparing the default and inquest papers, and appearing for the inquest hearing. (Berliner & Hall Decl., Ex. 2).

In addition to these billing entries, both Ms. Berliner and Ms. Hall have included entries in their fee application for tasks that appear to have no relation to their case against these defaulting defendants.[20] For example, Ms. Berliner spent 14.25 hours and Ms. Hall spent 8.25 hours opposing the non-defaulting defendants' motion to dismiss and motion for summary judgment. Ms. Berliner spent 7.25 hours and Ms. Hall spent 6 hours in telephone conversations and other correspondence with the City defendant, and in reviewing the City defendant's discovery. Ms. Berliner also billed a total of 3.25 hours making multiple copies of a "CD/DVD for City," presumably the surveillance video, and corresponding with the City's attorneys regarding the CD/DVD. Without further explanation as to how these tasks relate to plaintiffs' case against the defaulting defendants, the Court respectfully recommends that plaintiffs not be awarded fees for these entries at this time.

Ms. Berliner and Ms. Hall also included time that was spent preparing for and conducting depositions in this case. The Court finds these billing entries unrelated to the instant default proceedings against defendants Anderson and Tavarez and therefore recommends that the 24 hours spent by Ms. Berliner and the 18.5 hours spent by Ms. Hall conducting and appearing with their clients for depositions not be included in plaintiffs' fee award.

Ms. Hall records 11.75 hours spent corresponding with Paul Iadanza, a Certified Public

_____

[20]Ms. Berliner billed 8 hours and Ms. Hall billed 9 hours preparing for the Colons' "50-H hearing" which is required by the City in cases such as this and is potentially not an expense that should be attributed to the defaulting defendants.

42

Accountant, and reviewing his report. Ms. Berliner also billed 5.75 hours for her time researching forensic accountants and on calls with Iadanza. Plaintiffs have provided no information as to how Iadanza's work relates to plaintiffs' claims against the defaulting defendants. Indeed, the only accounting report submitted to the Court was prepared by CPA DeVito's firm and appears to bear no relation to CPA Iadanza.[21] As plaintiffs have not submitted any other reports prepared by Iadanza in support of their calculation of damages, the Court recommends that these hours be excluded from their fee award.

Accordingly, the Court recommends that Ms. Berliner's billed hours be reduced by 54.5 hours and Ms. Hall's billed hours be reduced by 44.5 hours to account for fees unrelated to the proceedings against the defaulting defendants.

Turning to the remaining billing entries, the Court considers the time plaintiffs' counsel spent on other tasks related to plaintiffs' case against the defaulting defendants. Although the 23-page Complaints filed in plaintiffs' cases lack detail and are almost identical, Ms. Berliner seeks fees for a total of 18.25 hours preparing and serving the summons and Complaints. In addition, Ms. Berliner billed a total of 16.5 hours of calls and meetings with Ms. Hall and roughly 10.5 hours in calls and meetings with her client. Ms. Hall billed roughly 12.5 hours for meetings and calls with Ms. Berliner and approximately 12 hours for meetings with her client. The fee application does not indicate whether these meetings and calls related to the defaulting defendants or the other defendants in the case.

_____

[21]Plaintiffs have submitted a May 7, 2010 invoice for Iadanza's work on this case, which indicates that he met with plaintiffs and their attorneys, participated in telephone conferences, and reviewed and analyzed documents and written correspondence. (Berliner & Hall Decl., Ex. 2). However, plaintiffs provide no explanation as to how Iadanza's work related to plaintiffs' case against the defaulting defendants.

Ms. Berliner spent roughly 21 hours preparing the default and inquest papers and appearing at the inquest hearing. (Berliner & Hall Decl., Ex. 4). In addition, Ms. Hall spent a total of 9.5 hours preparing and appearing for the inquest hearing. (Id., Ex. 2). Therefore, the time counsel spent on the default motion and inquest alone totals over 30 hours. However, in reviewing the documentation submitted in support of plaintiffs' damage calculations, the Court notes that plaintiffs' submissions consisted almost entirely of Exhibits, including professional reports, retainers, invoices, contracts of sale, lease, and other documents related to plaintiffs' business. Plaintiffs did not file any memoranda of law supporting their request for damages nor did they submit declarations explaining their exhibits in support of their compensatory, punitive, or emotional distress damages; they only submitted a memorandum and a declaration in support of their application for fees and costs.

In light of the straightforward nature of the default proceedings against defendants Tavarez and Anderson and based on the Court's review of the documentation counsel prepared for these default proceedings, the Court concludes that there was both redundancy in billing and excessive billing and therefore respectfully recommends reducing plaintiffs' fees by 10% after reduction for hours spent unrelated to the defaulting defendants.

Accordingly, the Court respectfully recommends that plaintiff Jose Colon be awarded $31,185, representing the 99 hours[22] spent by Ms. Berliner on plaintiffs' against the defaulting defendants, less 10%. With respect to Ms. Hall's fees, the Court respectfully recommends that

_____

[22]The Court arrived at this number by subtracting the 54.5 hours Ms. Berliner spent on matters unrelated to the proceedings against the defaulting defendants from the 153.5 hours Ms. Berliner included in her fee application.

plaintiff Maximo Colon be awarded $21,735, representing the 69 hours[23] spent by Ms. Hall on plaintiffs' case against the defaulting defendants, less 10%.

## 2. Costs

Plaintiff Jose Colon also seeks reimbursement of the costs and expenses incurred in prosecuting this case in the amount of $4,876.43, while plaintiff Maximo Colon seeks reimbursement of costs and expenses in the amount of $3,066.51. In support of their requests, Ms. Berliner and Ms. Hall have submitted affirmations detailing the expenses, but neither provided supporting documentation for any of the charges.

It is clear that when a plaintiff prevails in a civil rights action, the court will generally award plaintiff any reasonable out-of-pocket expenses incurred by his attorney that would normally be charged to the attorney's fee-paying clients. See Cabrera v. Fischler, 814 F. Supp. at 291 (citing Reichman v. Bonsignore, Brignati & Mazzotta P.C., 818 F.2d 278, 283 (2d Cir. 1987)). Thus, the Second Circuit has held that the costs that may be awarded in a civil rights case are not limited to the costs authorized by 28 U.S.C. § 1920, but may include "'reasonable'" expenses that are "'incidental and necessary' to the representation." Reichman v. Bonsignore, Brignati & Mazzotta P.C., 818 F.2d at 283 (quoting Northcross v. Board of Education, 611 F.2d 624, 639 (6th Cir. 1979), cert. denied, 447 U.S. 911 (1980)).

Here, to the extent that plaintiffs seek reimbursement for the costs of filing and service fees, this Court finds that the request is "reasonable" and respectfully recommends that the

---

[23]The Court arrived at this number by subtracting the 44.5 hours Ms. Hall spent on matters unrelated to the proceedings against the defaulting defendants from the 113.5 hours Ms. Hall included in her fee application.

45

request be granted. To the extent that the plaintiffs seek $1,500.00 in fees for CPA Iadanza and $3,000 in fees for CPA Devito,[24] these are the types of disbursements that are typically subject to compensation under the statute. See, e.g., Mendoza v. City of Rome, 162 F.R.D. 260, 264 (N.D.N.Y. 1995). However, in the absence of any supporting documentation providing the hourly rates charged, the time spent and a description of the work performed, this Court cannot determine whether these charges are "reasonable." Similarly, to the extent that plaintiffs seek reimbursement for photocopies, mail, and telephone calls, these costs may be appropriate for reimbursement, but in the absence of any further explanation as to why the costs were necessary and some supporting documentation to show that these costs were incurred in connection with the prosecution of the defaulting defendants, this Court cannot determine if the expenses were reasonable in this case.[25]

This Court respectfully recommends that, with the exception of the $350 each plaintiff requests for filing and service fees and the $150 each plaintiff expended on interpreter fees for the inquest hearing, plaintiff's request for costs be denied subject to a further submission from counsel.

---

[24]Ms. Berliner and Ms. Hall both request $1,500 for payments made to CPA DeVito, for a total of $3,000. However, they provide no documentation in support of these costs apart from copies of two checks made out to Francis C. DeVito in the amount of $1,500 each. (See Decl. of Damages, Ex. 2).

[25]Plaintiffs have included a number of costs that appear entirely unrelated to plaintiffs' case against the defaulting defendants, including $1,566.54 in transcript fees and $93.36 in costs associated with the printing and delivery of their motion to dismiss and motion for summary judgment papers, which were prepared in connection with their claims against the settling defendants.

46

## CONCLUSION

In summary, the Court respectfully recommends that defendants Henry Tavarez and Steven Anderson be held jointly and severally liable to plaintiffs as follows: (1) plaintiff Jose Colon to be awarded $213,393.95, representing $131,708.95 in lost wages,[26] $50,000 in emotional distress damages, $31,185.00 in attorney's fees, and $500.00 in costs; and (2) plaintiff Maximo Colon to be awarded $218,943.95, representing $131,708.95 in lost wages, $65,000 in emotional distress damages, $21,735.00 in attorney's fees, and $500.00 in costs.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
February 9, 2012

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

---

[26]The Court arrived at this number by dividing the total award of lost wages ($263,417.89) by two, given plaintiffs' representations that they were co-owners of their business and shared all profits and costs of the business equally.

47